IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| HENRY JAMES, )<br>    Plaintiff, ) | Civil Action No. 7:16cv00442 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| VA. DEP'T OF CORR., *et al.*, ) | By: Norman K. Moon |
|     Defendants. ) | United States District Judge |

Henry James, a Virginia inmate, filed this civil rights action alleging several Virginia Department of Corrections ("VDOC") employees: (1) failed to provide reasonable accommodations to his various health issues; (2) failed to allow the performance of certain Sabbath ceremonies; and (3) failed to offer a Kosher diet that adequately considered his other dietary restrictions. The Court will grant the defendants' motions for summary judgment because (1) VDOC reasonably accommodated James's health issues, (2) James failed to exhaust administrative remedies before filing his suit, and (3) the combination of meals, medication, and counseling offered by VDOC did not substantially burden James's religious practice.[1]

**I.**

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the

---

[1] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* Here, Defendant Dr. Benny Mullins has submitted an affidavit and records in support of his motion to dismiss (dkt. 36), which Dr. Rose Dulaney incorporated in her motion to dismiss (dkt. 62). Likewise, the remaining defendants filed a motion for summary judgment including five affidavits (dkt. 52). Plaintiff responded by filing forty-two pages of evidence in response to the Defendant Mullins and Dulaney (dkt. 68-1), and further filing thirty-four pages of evidence in response to the other Defendants (dkt. 76-1). While Plaintiff argues summary judgment would be premature (dkt. 72 at 1), he does not specify what additional facts he might need. *See* Fed. R. Civ. P. 56(d). Finding the parties have been "given a reasonable opportunity to present all the material that is pertinent to the motion," the Court will convert the motions to dismiss into motions for summary judgment.

movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court recounts the following facts drawing all reasonable inferences in James's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

## II.

On May 1, 2015, James arrived at the Wallens Ridge State Prison ("WRSP") wearing medical braces on his back and his right knee. During intake, the security supervisor advised James that such braces were not allowed at WRSP. In the following days, James was kept at the infirmary while medical staff evaluated his medication, his need for the braces, and waited for a bottom bunk to open up. James was waiting for a bottom bunk to open up because a previous facility had determined James required a lower bunk because of his knee and back issues, a conclusion WRSP agreed with. During this time he was denied regular access to the dining hall, out-of-cell activities, the recreation area, visits, and the commissary. On May 11, 2015, James received a bottom bunk assignment in the general population. Later, James was transferred to other prisons for various medical consultations. On his return, he had to wait in the infirmary for two other periods (of twelve and seven days respectively) while again waiting for a bottom bunk.

In late 2015, James separately asked various VDOC employees for matzah and two four-ounce cups of grape juice to perform Sabbath ceremonies. However, he never filed the "Request for Approval of Faith Object" form identified in VDOC Operating Procedure 841.3. These forms are available to prisoners upon request. Because James never submitted this request, the Faith Review Committee was unaware of his desire for matzah bread and grape juice.

2

Finally, James has a history of high cholesterol. At WRSP, James was given Kosher "Common Fare" food trays because he is Jewish. This tray frequently includes eggs or products that contain eggs. Worried about the impact of eggs on his cholesterol level, James sought a "cardiac" meal tray from various defendants. While WRSP made a cardiac tray available for regular and vegetarian fare meals, it did not have a cardiac-specific version of the Common Fare tray. WRSP believed the Common Fare tray was "heart healthy" in spite of the eggs. Dieticians and doctors also met with James to prescribe medicine for his high cholesterol and counsel him on what foods he should eat. James refused to take the prescribed medicine because he believed it was ineffective and continued to buy unhealthy food from the commissary. James claimed his egg-yolk consumption caused chest pain, light headedness, shortness of breath, cold sweats, and acute head pain. WRSP started excluding eggs from James's tray on October 28, 2016.

### III.

The Court works through each of James's three claims, collectively addressing the various arguments put forward in defendants' motions for summary judgment.[2]

### A. Claim 1

In Claim 1, James alleges the VDOC, Director Clarke, Warden Fleming, Officer Christy Church, and Dr. Dulaney violated the Eighth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA") by placing him in the infirmary. As stated above,

---

[2] At the outset, the Court will dismiss all claims against the defendants "Sergeant Chriss" and "Dr. Biernstein" without prejudice. James listed both as defendants in his complaint. However, the Office of the Attorney General ("OAG") did not discover anyone by those names. For Sergeant Chriss, the OAG reviewed prison employment records and searched name-analogues, including: Chris, Cris, Criss, Crist, and Crisp. For Dr. Biernstein, the defendants contacted the WRSP medical department and reviewed James' records. James states he saw Dr. Biernstein on April 6, 2016 and June 7, 2016, but his medical reports showed James saw a Dr. Osemobor on April 6, 2016, and a Dr. McCarthy on June 7, 2016. James was warned he must provide more identifying documentation on the two defendants, but he was unable to do so. (*See* dkts. 40, 48, 49, 50, 75).

the periods of isolation occurred when James was being transferred back to WRSP, his medical issues were being evaluated, and the defendants were waiting for an available bottom bunk to become available. James has knee and back problems, requiring him to use a bottom bunk.

   1. *Eighth Amendment*

In order to make out an Eighth Amendment violation based on prison conditions, "a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016) (citation omitted). "The first prong is objective and requires that the deprivation be 'sufficiently serious'; the second requires us to determine whether subjectively 'the officials acted with a sufficiently culpable state of mind.'" *Id.*

James states he was excluded from several activities and programs while in medical isolation and segregation, but he does not allege that he suffered any serious injury or substantial risk of injury. James's claim must fail because his evidence of temporary inconvenience cannot sustain an Eighth Amendment claim. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("[E]xtreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."); *Jackson v. Ray*, No. 7:06-CV-00167, 2006 WL 840317, at *2 (W.D. Va. Mar. 28, 2006) ("While being confined in segregation may be restrictive and inconvenient, the plaintiff does not allege that he has suffered a serious mental or physical injury as a result of his conditions of confinement in segregation, and there is no indication that the conditions pose an unreasonable risk of serious harm.").

Drawing all disputed facts and reasonable inferences in favor of plaintiff, the Court concludes James fails to demonstrate a genuine dispute of material fact here.

*2. ADA and RA*

James alleges the same conduct also gave rise to claims under the ADA and RA. In order to establish a violation of the ADA or the RA, James must prove: (1) he has a disability; (2) he is otherwise qualified for the benefit in question; and (3) he was excluded from the benefit due to discrimination on the basis of the disability.[3] *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]"). The statutory rights created by the ADA and the RA "must be considered in light of reasonable requirements of effective prison administration." *Gates v. Rowland*, 39 F.3d 1439, 1446 (9th Cir. 1994).[4] Importantly, however, the Department of Justice has issued regulations clarifying that "[u]nless it is appropriate to make an exception," the ADA is violated when a state prison denies an inmate access to services by discriminatorily placing him in an infirmary unit when he is not receiving medical care or treatment. *See* 28 C.F.R. § 35.152(b)(2)(ii); *see also id.* at § 35.152(b)(2)(i) (state prisons "[s]hall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available.").

As a threshold matter, the Fourth Circuit has held the ADA and RA do not recognize causes of action against employees in their individual capacities. *Baird ex rel. Baird v. Rose*,

---

[3] The Fourth Circuit applies the same analysis to both the ADA and the RA because "the language of the two statutes is substantially the same." *Doe*, 50 F.3d at 1264. *See Bane v. Virginia Dep't of Corr.*, No. 7:12-CV-159, 2012 WL 6738274, at *11 n.10 (W.D. Va. Dec. 28, 2012) (discussing Fourth Circuit law on the two statutes).

[4] The Fourth Circuit has not addressed the propriety of applying *Turner v. Safley*, 482 U.S. 78 (1987), in the ADA context. However, it has stated in this context that the reasonableness of accommodations is "generally assessed in light of the totality of the circumstances." *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175 (4th Cir. 2009). This Court agrees with other circuits that have considered the concerns raised by *Turner* in this context. *See Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996) ("Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account."); *Kutrip v. City of St. Louis*, 329 F. App'x 683, 684 (8th Cir. 2009) ("District courts should consider the factors articulated in *Turner v. Safley*, 482 U.S. 78 when reviewing ADA / RA claims.").

192 F.3d 462, 471 (4th Cir. 1999); *see also* 42 U.S.C. § 12132 (providing a remedy only against a "public entity"). However, "the doctrine of *respondeat superior* applies in the ADA context, so the actions of the individual defendants can serve as the basis for finding VDOC . . . in violation of the statute." *Bane v. Virginia Dep't of Corr.*, No. 7:12-CV-159, 2012 WL 6738274, at *10 (W.D. Va. Dec. 28, 2012). So the Court considers these claims as against the individuals in their official capacities and as against VDOC.

VDOC argues it retains sovereign immunity from suit under the Eleventh Amendment. But it is clear that Virginia has consented to suit under the RA by receiving federal funding. *See* 42 U.S.C.A. § 2000d-7(a)(1); *see also Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005). Whether Virginia is also subject to suit under the ADA is more complicated. *See Chase v. Baskerville*, 508 F. Supp. 2d 492, 499 (E.D. Va. 2007) (finding the ADA does not validly abrogate state sovereign immunity in the state prison context), *aff'd,* 305 F. App'x 135 (4th Cir. 2008). The Court need not reach that question here because James's evidence is insufficient to make out an ADA violation. *See Hale v. King*, 642 F.3d 492, 503 (5th Cir. 2011) ("Exercising judicial restraint, we do not proceed to the other two prongs of the *Georgia* inquiry at this time because such an inquiry, which would include resolution of constitutional issues, is unnecessary unless and until Hale has stated a violation of Title II."); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). For purposes of this opinion then, the Court will assume without deciding that sovereign immunity does not bar the ADA claim.

The Court will also assume James can make out the first two elements of his ADA and RA claims. However, James's ADA and RA theories must fail because he cannot satisfy the third element; that is, James cannot demonstrate he was excluded from a benefit due to

discrimination on the basis of his disability. James was temporarily placed in the infirmary from May 1 to May 11 and was unable to participate in several services available to other inmates during that time. But VDOC was not discriminating against James on the basis of his disability, it was instead evaluating his medical needs and preparing his desired accommodation. (Dkt. 52-2 at 2-3 ("[I]t was necessary to make a full complete evaluation of his medical needs before placing him in a housing unit where there are steps and other potential issues for an offender with potential mobility issues.")). Specifically, James arrived at WRSP on several medications, and intake officials had removed James's transcutaneous electrical nerve stimulation unit and his braces. The WRSP staff was required to evaluate what treatment James would require while at WRSP. The eleven days James spent in the infirmary were reasonable when "considered in light of reasonable requirements of effective prison administration." *Gates*, 39 F.3d at 1446.

Likewise, James was twice placed in the infirmary after being transferred back to WRSP from medical appointments. While James was not medically reevaluated as with his initial stay in the infirmary, these waits were also because his "medical order for a bottom bunk was still in effect" and "there were no bottom bunks available for him in general population." (Dkt. 52-2 at 6). James was being transferred from medical consultations. WRSP was attempting to accommodate James, as it was required to do, by finding a bottom bunk. Especially when considered in light of the reasonable requirements of effective prison administration, these temporary delays were eminently reasonable. *See Turner v. Safley*, 482 U.S. 78, 92–93 (1987) ("[W]e think that the choice made by corrections officials—which is, after all, a judgment 'peculiarly within [their] province and professional expertise,'—should not be lightly set aside by the courts." (internal citation omitted)). No reasonable jury could find James was excluded from a benefit due to discrimination on the basis of his disability.

Accordingly, the defendants are entitled to summary judgment on Claim 1.

7

**B. Claim 2**

In Claim 2, James alleges Warden Fleming, Director Clarke, Manager Eacho, and Chaplain Mitchell conspired to violate his rights and discriminate against him by denying religious accommodations James desired. Specifically, James was unable to perform the Kiddush and Havdalah ceremonies on the Sabbath because prison officials did not allow him to have matzah bread and grape juice in his cell. James offers two different theories, but each fails.

*1. Religious Discrimination*

James argues that the defendants discriminated against him based on his religion by denying him matzah and grape juice for use during the Havdalah and Kiddush ceremonies, which violates the Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). At WRSP, the Faith Review Committee ("FRC") assesses prisoner requests for religious items and determines the accommodation necessary compared to security and the legitimate penological interests of the VDOC. Any denial of accommodation is made by the FRC in conjunction with Jewish faith leaders. The FRC had previously determined that matzah and grape juice would be available only during Passover.

The defendants argue that James's religious discrimination claim is unexhausted under the Prison Litigation Reform Act because he failed to follow proper procedure by filing a "Request for Approval of Faith Object." 42 U.S.C. § 1997e(a) (requiring an inmate to exhaust administrative remedies before filing a § 1983 complaint); VDOC Operating Procedure 841.3, Request for Approval of Faith Object. To properly exhaust, a plaintiff must adhere to the agency's deadline and procedural rules and give an agency "a fair and full opportunity to adjudicate [the] claims." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). VDOC Operating Procedure

841.3 is available to inmates, and James has not shown that he completed the request process.[5] Because of his failure to comply with procedure, the FRC was unaware that James wanted grape juice and matzah for use in his religious practices. (Dkt. 51-1 at 3). Thus, VDOC officials never had a full and fair opportunity to evaluate his request, and so the Court will grant the defendants' motion for summary judgment on this theory.

   *2. Equal Protection*

James also tries to frame this claim as an equal protection violation. To prove an equal protection claim, an inmate plaintiff must show that he has been treated differently than other inmates and that the disparate treatment is not reasonably related to a legitimate penological interest. *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989). Here, James is not similarly situated to inmate populations at other institutions. *See Klinger v. Neb. Dep't of Corr.*, 31 F.3d 727, 732 (8th Cir. 1994) (holding that inmates housed at different prisons were not similarly situated for Equal Protection purposes because "different institutions with different inmates each operat[ed] with limited resources to fulfill different specific needs"). And at WRSP, inmates are only allowed matzah and grape juice during Passover. Whether this is a problem under RLUIPA or the First Amendment is a different question, one that may be challenged after administrative remedies are exhausted, but James has not demonstrated that he has been treated differently than similarly situated inmates. Drawing all disputed facts and reasonable inferences in favor of James, the Court concludes that James's allegations do not create a genuine dispute of material fact as to the equal protection claim

---

[5] On December 1, 2017, after the defendants moved for summary judgment, it appears that James belatedly tried to exhaust the claim by filing a request form. However, the form used is still incorrect and it is addressed to the warden, not the Faith Review Committee. (*See* dkt. 78). Additionally, the exhaustion requirement must be satisfied *before* the suit is filed. *See, e.g., French v. Warden*, 442 F. App'x 845, 846 (4th Cir. 2011) ("[B]ased on the dates of his initial grievance and the filing of the complaint in this action, he could not have completed the grievance process *before he filed suit in the district court*." (emphasis added)).

Accordingly, the defendants are entitled to summary judgment regarding Claim 2.

## C. Claim 3

James also avers the defendants were deliberately indifferent to his high cholesterol levels, they forced him to choose between a Kosher menu that would exacerbate his cholesterol issues and an appropriate diet that would violate his religious convictions, and they treated him differently than inmates were treated at a previous facility. Specifically, James alleges Dr. Mullins, Dr. Dulaney, VDOC Food Services Director Engelke, Dietician Gregg, WRSP Food Services Director Stallard, Health Services Director Schilling, Director Clarke, and Chief of Operations Robinson were behind these issues.

*1. Deliberate Indifference*

To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" that constitute "an unnecessary and wanton infliction of pain" or that are "repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Deliberate indifference may be demonstrated by either actual intent or reckless disregard. . . . Nevertheless, mere negligence or malpractice does not violate the eighth amendment.

*Miltier v. Beorn*, 896 F.2d 848, 851-52 (4th Cir. 1990) (internal citations removed) *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). *Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Furthermore, "questions of medical judgment are not subject to judicial review." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (citing *Shields v. Kunkel*, 442 F.2d 409 (9th

Cir. 1971)); *see also Calvert v. Sharp*, 748 F.2d 861, 862 n.2 (4th Cir. 1984) (citing *Estelle*, 429 U.S. at 106) *abrogated on other grounds by West v. Atkins*, 487 U.S. 42 (1988) (An inmate's mere "complaints about the quality of the medical treatment [] do not amount to deliberate indifference to serious medical needs, [which is] the constitutional test."); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990) ("Disagreements between an inmate and a physician over treatment do not state a claim under § 1983.").

Dr. Dulaney was James's primary care physician and Dr. Mullins was a physician contracted to serve the general prison population at WRSP. On October 28, 2015, James's LDL cholesterol levels were 135. A reading of 130 or less is acceptable, less than 100 is ideal. In March of 2016, Dr. Dulaney tested James's cholesterol level again; his LDL level had dropped to 121. On July 6, 2016, James first saw Dr. Mullins on July 6, 2016, and he informed Dr. Mullins that he was on a lipid-lowering medication called Zocor and that he had made dietary changes to lower his cholesterol level. Dr. Mullins counseled James on his cholesterol level and general cardiac health. On August 15, 2016, Dr. Mullins noted that James's LDL cholesterol level was at 124, which is acceptable but "borderline." Dr. Mullins treated James by increasing the dose of Zocor and offering further counseling. On August 17, 2016, James voluntarily decided to stop taking the Zocor.

On August 24, 2016, Dr. Mullins saw James regarding James's refusal to take the Zocor. James claimed that the medication was "ineffective" and he told Dr. Mullins about his concern of having too many eggs in his diet. Dr. Mullins advised James that the Common Fare diet was "cardiac healthy" as defined by the Department of Agriculture Nutritional Guidelines, that the prevailing medical opinion is that only twenty percent of a person's LDL cholesterol level is affected by diet, and that Dr. Mullins had no authority to order the VDOC Dietary Department to modify meal trays. On August 31, 2016, Dr. H. Smith saw James and noted that, even without

medication, his LDL cholesterol level was within the acceptable range. Dr. Mullins next saw James on September 19, 2016. James continued to refuse the suggested Zocor and argue with Dr. Mullins about the eggs in his diet. Dr. Mullins again counseled James that the Common Fare diet was heart-healthy, but, at James's insistence, Dr. Mullins ordered a "cardiac diet" and sent the information to the food service department. Dr. Mullins' "cardiac diet" order did not create a special cardiac tray, it merely removed all egg items from his Common Fare meals.

James generally alleges that Dr. Mullins and Dr. Dulaney were deliberately indifferent to his high cholesterol condition because they prescribed "ineffective" medication and ignored his requests for a cardiac-healthy Common Fare tray. Even assuming *arguendo* borderline cholesterol is a serious medical need, James received prompt and effective treatment from WRSP's medical staff. *See McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016) (asserting that high cholesterol is a serious medical need because even though it does not have symptoms, the condition can progress and cause potentially deadly health problems). The physicians repeatedly followed up with James, offering testing, treatment, and advice. Furthermore, James's disagreement with the course of treatment, specifically that the doctors failed to prescribe effective medication and order a cardiac meal tray, does not support a constitutional claim against Dr. Mullins and Dr. Dulaney. *See Harris*, 761 F. Supp. at 414; *Brembry v. United States*, No. 7:10-cv-388, 2011 WL 121741, at *11 (W.D. Va. Jan. 13, 2011) (internal alterations, quotation marks, and citation removed) ("In other words, medical decisions such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview."). James also ignored medical advice by refusing to take prescription medication even though Dr. Mullins informed him that diet only minimally affects high cholesterol readings.

Although an inmate's medical treatment may not be "as prompt as one . . . might have wished, the fact that he was treated generally defeats a claim of deliberate indifference." *Wells v.*

*Franzen*, 777 F.2d 1258, 1264 (7th Cir. 1985). James admits in his pleadings that WRSP medical staff prescribed medication, counseled him regarding medication and diet, and ultimately ordered a "cardiac" Common Fare tray for him. Drawing all disputed facts and reasonable inferences in favor of James, the Court concludes James has not demonstrated a genuine dispute of material fact regarding his treating physicians' deliberate indifference claim.

James also attempts to bring claims against his physicians' supervisors. To bring a medical treatment claim against non-treating prison officials, the plaintiff must show that the supervisory defendants: (1) failed to promptly provide an inmate with needed medical care, (2) deliberately interfered with the prison doctors' performance, or (3) tacitly authorized or were indifferent to prison physicians' constitutional violations. *Miltier*, 896 F.2d at 854. Furthermore, "[i]f a prisoner is under the care of medical experts . . . , a nonmedical official will generally be justified in believing that the prisoner is in capable hands." *Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (internal quotation marks and citation removed). James believes that the Common Fare diet harmed his health by increasing his cholesterol levels, and that the defendants are liable for the harm. However, James admits that he received prompt medical care, he has not alleged that any non-medical defendant interfered with the performance of the prison doctors, and the Court concluded above that James has not demonstrated that the prison physicians' actions violated the Constitution. Drawing all disputed facts and reasonable inferences in favor of the plaintiff, James fails to demonstrate a genuine dispute of fact regarding the non-medical defendants' alleged deliberate indifference.

*2. Religious Discrimination*

"The Free Exercise Clause of the First Amendment forbids the adoption of laws designed to suppress religious beliefs or practices." *Wall v. Wade*, 741 F.3d 492, 498 (4th Cir. 2014) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001)). This prohibition

extends to "policies that impose a substantial burden on the prisoner's right to practice his religion." *Id.* (citing *Lovelace v. Lee*, 472 F.3d 174, 198 & n.8 (4th Cir. 2006)). A "substantial burden" on religious exercise occurs when the government, through act or omission, puts substantial pressure on an adherent to modify religious behavior or choose between a government benefit and a religious precept. *See Lovelace*, 472 F.3d at 187 (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). To succeed on a free exercise claim, an inmate must demonstrate that a regulation substantially burdens a sincerely held religious belief; the prison officials then must demonstrate that the regulation is reasonably related to legitimate penological interests. *Wall*, 741 F.3d at 498–99. "A substantial burden must impose more than an inconvenience on a prisoner's right to freely practice his or her religion." *Gordon v. Mullins*, No. 7:12cv494, 2014 WL 1118199, at *5, (W.D. Va. Mar. 20, 2014) (citation omitted), *aff'd*, 582 F. App'x 248 (4th Cir. 2014).

Congress enacted RLUIPA to "provide greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 135 S.Ct. 853, 859–60 (2015) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2760 (2014)). RLUIPA mandates a higher standard of review for government actions than that used in constitutional claims—strict scrutiny instead of reasonableness. *Lovelace*, 472 F.3d at 186. However, "RLUIPA incorporates the 'substantial burden' test used in First Amendment inquiries and expressly refers to the Free Exercise Clause in allocating its burden of proof." *Id.* at 198 n.8; 42 U.S.C. § 2000cc–2 ("If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion" on any element of the claim except the "substantial burden" element).

Courts have repeatedly held that inmates may be entitled to meals that meet their religious beliefs, but they are not entitled to have those meals conform to their personal preferences. *Compare Wall*, 741 F.3d at 495 ("Under the Free Exercise Clause, a prisoner has a clearly established right to a diet consistent with his religious scruples, including proper food during Ramadan." (quoting *Lovelace*, 472 F.3d at 198–99) (internal quotation marks omitted)), *with Malik v. Sabree*, No. C.A.NO. 8:06–319–RBH, 2007 WL 781640, at *5 (D.S.C. Mar. 13, 2007) (concluding that there was no substantial burden on free exercise when the prison provided meat that met an inmate's religious precepts, but was not the Halal meat he preferred), *Couch v. Jabe*, 479 F. Supp. 2d 569, 585 (W.D. Va. 2006) (asserting that receiving religiously appropriate, but cold meals during part of Ramadan was not a substantial burden), *and Hatcher v. Bristol City Sheriff's Office*, No. 7:08cv440, 2008 WL 2944557, at *3 (W.D. Va. July 29, 2008) (holding a pork-free diet did not impose a substantial burden when inmate could meet his religious needs with other menu items.).

James alleges that his free exercise rights have been violated by VDOC and WRSP policies that force him to choose between adhering to the dictates of his religious diet and receiving a cardiac diet. James contends that the health benefits he must forgo to maintain his religious dietary requirements place substantial pressure on him to abandon his religious precepts. A prisoner's claim that his free exercise rights have been violated is analyzed under a two-step inquiry. *Wall v. Wade*, 741 F.3d 492, 498-99 (4th Cir. 2014). First, the plaintiff must show a substantial burden of a sincerely held religious belief. If plaintiff makes this showing, defendants must show the burden is "'reasonably adapted to achieving a legitimate penological objective." *Id.* (quoting *Lovelace*, 472 F.3d at 200).

James's claim fails at the first step: The prison has not substantially burdened James's sincerely held religious beliefs. First, while James is correct that general fare and vegetarian

15

offenders have the option of a cardiac tray while Common Fare offenders do not, the Common Fare diet is already "heart healthy." (Dkt. 52-5 at 2). Second, James refuses to take the high cholesterol medicine that has been prescribed for him because he believes it to be ineffective. (Dkt. 52-2 at 6-7; dkt. 36-1 at 2). But there is no evidence that the medicine actually is ineffective, and James cannot create a burden by refusing this alternative. Third, James received materials and literature to help educate him on what dietary options are most healthy and what foods are inappropriate to buy from the commissary. (Dkt. 52-4 at 3). James, however, has purchased various unhealthy foods from the commissary that would contribute to his high cholesterol. (*Id.* at 4). Fourth, even with these ongoing problems, James's cholesterol level remained at "acceptable" levels. (Dkt. 36-1 at 2). Fifth, and finally, his diet now no longer contains eggs. (Dkt. 36-1 at 2; dkt. 52-5 at 3). To the extent James has high levels of cholesterol, the defendants are not the cause of that burden.

The plaintiff in *Hoye v. Clarke* presented a similar issue: A diabetic inmate on the Common Fare diet sought a diabetes-specific Common Fare meal tray. No. 7:14CV00124, 2015 WL 3407609, at *1 (W.D. Va. May 27, 2015), *aff'd*, 628 F. App'x 199 (4th Cir. 2016). The court denied his request for the specific meal tray because, like James, the plaintiff would be able to manage his diet through counseling regarding his lifestyle and diet choices. The court thought that any "mere inconvenience" that might arise from not having his preferred menu did not rise to the level of a substantial burden on his religious exercise. 2015 WL 3407609, at *4 (quoting *Brown v. Mathena*, No. 7:14cv20, 2014 WL 4656378, at *5 (W.D. Va. Sept. 16, 2014)). While it may be more convenient for James to have a cardiac-specific Common Fare meal plan, James's beliefs are not substantially burdened by the lack of such a tray because James "can adequately manage his condition through other reasonable modifications." *Id.* at *9.

Drawing all disputed facts and reasonable inferences for the plaintiff, James fails to demonstrate a genuine dispute of material fact as to his religious discrimination claim.

*3. Equal Protection*

Lastly, James argues that the defendants have violated his equal protection rights because non-Common Fare inmates and inmates at other institutions receive the option of a cardiac tray. However, inmates are not similarly situated to non-Common Fare offenders or offenders at other institutions. *See e.g.*, *DePaola v. Va. Dep't of Corr.*, No. 7:12cv592, 2013 WL 6804744, at *5 (W.D. Va. Dec. 20, 2013) (asserting that plaintiff inmate is only similarly situated to inmates at his prison participating in the Common Fare diet); *Klinger*, 31 F.3d at 732. Therefore, James cannot show that he has been treated differently than similarly situated inmates because WRSP does not offer a cardiac Common Fare tray to any inmates participating in Common Fare. Drawing all disputed facts and reasonable inferences for the plaintiff, James has not established a genuine dispute of material fact as to the Common Fare equal protection claim. Accordingly, the defendants are entitled to summary judgment as to Claim 3.

**V.**

For the reasons stated herein, the Court will grant the defendants' motions for summary judgment. The Clerk is directed to send a copy of this memorandum opinion and the accompanying order to the parties.

**ENTER:** This  28th  day of March, 2018.

*signature: Norman K. Moon*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE